UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

**WINIFRED MACHEDA and RICHARD MACHEDA,**

**Plaintiffs,**

**-v-** **5:04-CV-325**

**HOUSEHOLD FINANCE REALTY CORPORATION OF NEW YORK,**

**Defendant.**

♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

APPEARANCES:

RONALD L. VAN NORSTRAND, ESQ.
Suite 530, Century Plaza
201 East Jefferson Street
Syracuse, New York 13202
Attorney for Plaintiffs

PHILLIPS LYTLE LLP
Preston L. Zarlock, Esq., of counsel
William H. Baaki, Esq., of counsel
3400 HSBC Center
Buffalo, New York 14203
Attorneys for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this action by homeowners against a lender with which they entered into a mortgage loan, defendant moves (Dkt. No. 45) for summary judgment dismissing the action. Plaintiffs move (Dkt. No. 48) for partial summary judgment. Defendant is entitled to partial summary judgment establishing that plaintiffs cannot rescind so much of the loan as refinanced plaintiffs' previous loan with defendant; its motion is otherwise denied. Plaintiffs' motion is denied.

**BACKGROUND**

In their amended complaint (Dkt. No. 8), plaintiffs seek rescission of their mortgage and monetary and other relief under the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601 *et seq*.; the Home Ownership Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. §§ 1602(aa),1639; and New York General Business Law § 349. Insofar as is relevant to the present motions, plaintiffs' amended complaint alleges the following:

> The Plaintiffs purchased 44 Lincklaen Street in 1993 as their principal dwelling and have lived there together ever since. The Plaintiffs obtained an initial mortgage through the seller of the property, Robert Riedl.
>
> On May 25, 1995 the Plaintiffs obtained a loan and second mortgage through the Defendant in the amount of $45,000.00. This second mortgage was a revolving loan agreement, with an interest rate of 13.5 % and approximate monthly payments of $560.00.
>
> On or about January 1, 2001 the Plaintiffs contacted the Defendant to inquire about having the interest rate lowered on the second mortgage. The Plaintiffs spoke with the Defendant's account executive Veronica Bailey.
>
> The account executive advised the Plaintiffs that the Note and Mortgage they obtained in 1995 was a revolving loan similar to a credit card, and, therefore, in time the loan would come due in full and if the Plaintiffs did not pay the Note in full the Defendant would foreclose on their home. The account executive advised that the Plaintiffs should obtain another mortgage on their home to pay off the existing mortgages.
>
> The account executive took information from the Plaintiffs and arranged to meet them at their home to execute the necessary papers on March 27, 2001. The account executive went to the Plaintiffs home on March 27, 2001 to execute the necessary documents.
>
> When the Plaintiffs expressed concern about the interest rate, the account executive advised the Plaintiffs that since they operated a childcare facility in their home nobody else would give them a loan.
>
> Household required Plaintiffs to consolidate the two existing mortgages, ie $62,829.00 to Robert Riedl and $49,310.47 to the Defendant, persuaded them to borrow an additional $2,227.39 in cash, and imposed

approximately $10,123.80 in additional points, fees and settlement charges. As a result, the principal amount of the new loan was $139,538.04 and the payments were $1,226.16 per month for 360 months, with a disclosed annual percentage rate of 10.926 %.
***
The account executive told the Plaintiffs that the points and fees were necessary to obtain the loan and mortgage. The Plaintiffs were not advised of the relationships between points paid and the initial rate of the loan.

On March 27, 2001, the date of settlement, Plaintiffs entered into a consumer credit transaction with Household in which Household extended consumer credit, which was subject to a finance charge, was initially payable to Household and was made for personal, household, or family purposes.

As part of this consumer credit transaction, Household acquired a security interest, namely a mortgage, in 44 Lincklaen, Cazenovia, New York, which is used as the principal dwelling of the Plaintiffs.

In conjunction with the closing of this loan, the Plaintiffs were instructed to sign an acknowledgment of receipt of a document entitled "Notice of Right to Cancel" which was not dated. This Notice was addressed to the Plaintiffs and purported to advise them of their right to cancel the transaction within three business days of the loan date, which was identified as March 27, 2001. The cancellation date listed on the notice was March 30, 2001.

The Plaintiffs were not provided copies of any documents they signed on March 27, 2001. All copies of the documents signed by the Plaintiffs on March 27, 2001 were taken by the account executive when she left their home. The Plaintiffs did not receive copies of any documents until after the expiration of the cancellation period.
***
Because the transaction described herein met the HOEPA definition of a high rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction. 15 U.S.C. § 1639(b).

Household did not furnish the required HOEPA disclosures to Plaintiffs three days prior to their settlement.

Household did not provide the required Truth In Lending disclosures before consummation in a form the Plaintiffs could keep.

Household did not accurately disclose the "amount financed, finance

> charge, and annual percentage rate (APR)" on the TILA disclosure because it failed to include the credit insurance premiums in the finance charge. Household required the Plaintiffs to purchase the credit insurance products. This failure to properly disclose resulted in underdisclosing the finance charge and APR and overdisclosing the amount financed, beyond the tolerances permitted by TILA.
>
> ***
>
> Because of the violations of HOEPA and TILA listed above, Plaintiffs retained the right to rescind the transaction up to three years after its consummation.
>
> On March 5, 2004 and March 11, 2004, Plaintiffs rescinded the transaction by sending a notice of rescission by U.S. Mail, postage prepaid, certified mail, return receipt requested, which by reference are incorporated herein.
>
> Household received Plaintiffs' notices of rescission on March 9, 2004 and March 12, 2004.
>
> Household has twenty days from receipt of the notice of rescission to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction and to return to the Plaintiffs any money or property given by the Plaintiffs to anyone, including Household, as required by 15 U.S.C. § 1635(b) and Regulation Z, § 226.23(d)(2). If Household fails to take these necessary actions additional statutory damages will be triggered.

(Paragraph numbering omitted.)

The first cause of action is for rescission and actual and statutory damages due to defendant's alleged violation of TILA and HOEPA. The second cause of action is for equitable and monetary relief under New York General Business Law § 349(h). Plaintiffs also seek injunctive and declaratory relief and reasonable attorney's fees and costs.

Defendant moves (Dkt. No. 45) for summary judgment dismissing the action. As set forth below, the Court denies defendant's motion except insofar as it seeks partial summary judgment establishing that plaintiffs cannot rescind so much of the loan as refinanced plaintiffs' previous loan with defendant. Plaintiffs move (Dkt. No. 48) for partial summary judgment on certain

causes of action. Plaintiffs' motion is denied.

## DISCUSSION

### Applicable law, generally

Summary judgment is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a summary judgment motion, the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences and resolves all ambiguities in the nonmovant's favor. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp*., 424 F.3d 195, 205 (2d Cir. 2005).

TILA is to be construed liberally to effectuate its purpose of "assur[ing] a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. 1601(a); *accord Schnall v. Marine Midland Bank*, 225 F.3d 263, 267 (2d Cir. 2000); *see N.C. Freed Co. v. Board of Governors of the Fed. Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973) ("The Act is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation."). In 1994 Congress added the HOEPA amendments to TILA to require lenders to make additional disclosures to borrowers with "high-cost" or "high-rate" loans. *See* 15 U.S.C. § 1639.

### Applicability of TILA and HOEPA; use of property for business purpose

TILA expressly exempts from its coverage "[c]redit transactions involving extensions of credit primarily for business [or] commercial ... purposes[.]" 15 U.S.C. § 1603(1). Defendant contends that it is entitled to summary judgment dismissing plaintiffs' TILA and HOEPA claims

because the March 27, 2001 loan was used to maintain property used primarily for a business purpose, not for personal, family or household purposes.[1]

In support of its contention that the property was used primarily for a business purpose, defendant relies on plaintiffs' income tax returns. Defendant points to line 3 of plaintiffs' IRS Form 8829, which shows that plaintiffs use 52.13% of the home for a daycare business. From 1998 through 2004, plaintiffs took business deductions for depreciation of the property and interest paid on the debt.

Plaintiffs do not dispute that since 1997 they have operated a day care business in their home and have taken deductions for it on their tax returns. According to plaintiffs, however, the 52.13% figure reflected on line 3 of Form 8829 is the percentage of the total square footage of the home used for day care during certain hours of the day. In her affidavit, plaintiff Winifred Macheda explains that the first floor rooms, *i.e.*, kitchen, porch, living room, playroom and bathroom, are used for day care from 7:30 a.m. to 4:30 p.m. She adds that plaintiffs also use those rooms for personal, family and household purposes, that when the rooms are used for day care they are the same as when plaintiffs' family occupies them, and that there is no portion or room of the house that is used exclusively for day care.

A review of plaintiffs' 1998 IRS Form 8829, "Expenses for Business Use of Your Home," shows that plaintiff Winifred Macheda completed lines one through seven as follows:

| | |
|---|---|
| 1. Area used ... regularly for day care ... | 1,960 |
| 2. Total area of home | 3,760 |

[1] The Court rejects plaintiffs' argument that defendant waived this defense by admitting in its initial answer that the loan in issue was a consumer credit transaction. As defendant points out, defendant's answer to plaintiffs' amended complaint does not contain such an admission. A statement in a pleading that is superseded by an amended pleading without the statement is no longer a conclusive judicial admission. *See, e.g., Tho Dinh Tran v. Alphones Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002), *overruled on other grounds by Slayton v. American Exp. Co.*, 460 F.3d 215, 226-28 (2d Cir. 2006).

| | |
|---|---|
| 3. Divide line 1 by line 2. Enter the result as a percentage. | 52.13% |
| 4. Multiply days used for day care during year by hours used per day | 2,798 hr. |
| 5. Total hours available for use during the year (365 days x 24 hours) | 8,760 hr. |
| 6. Divide line 4 by line 5. Enter the result as a decimal amount. | .3194 |
| 7. Business percentage. For day-care facilities not used exclusively for business, multiply line 6 by line 3 (enter the result as a percentage). ... | 16.65% |

Accordingly, the percentage of plaintiffs' home used for day care reflected in line 7 was 16.65% in 1998. The tax returns do not support defendant's contention that the mortgage is not covered by TILA and HOEPA because the March 27, 2001 loan was used primarily for a business purpose. Defendant is not entitled to summary judgment on this ground.

**Applicability of HOEPA; the HOEPA threshold**

Defendant contends that plaintiffs' loan does not qualify for HOEPA protection because it does not satisfy the requirement that "the total points and fees payable by the consumer at or before closing will exceed ... 8 percent of the total loan amount." 15 U.S.C. § 1602(aa)(1)(B)(i).[2] The term "points and fees" under HOEPA includes all items included in the finance charge (except interest or the time-price differential) and all compensation paid to mortgage brokers. 15 U.S.C. § 1602(aa)(4).[3] It is undisputed in the case at bar that the points and fees paid by plaintiffs

---

[2] 15 U.S.C. § 1602(aa)(1) provides:
A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if –

(A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities...; or

(B) the total points and fees payable by the consumer at or before closing will exceed the greater of –

(i) 8 percent of the total loan amount; or

(ii) $400.

The sole requirement in issue in this case is the eight percent requirement in section 1602(aa)(1)(B)(i).

[3] 15 U.S.C. § 1602(aa)(4) provides:
For purposes of paragraph (1)(B), points and fees shall include –

(A) all items included in the finance charge, except interest or the time-price differential;

(B) all compensation paid to mortgage brokers;

(C) each of the charges listed in section 1605(e) of this title (except an escrow for future payment

(continued...)

were financed and the financed obligation was to be paid over the course of the loan.

Defendant argues that under HOEPA, the only charges to be included in the category of "payable by the consumer at or before loan closing" are those points and fees the mortgagor is required to pay at or before closing of a loan, not over the course of the loan. Thus, defendant argues, because plaintiffs' points and fees were financed, they were not payable at or before closing and cannot be counted to reach the eight percent threshold in section 1602(aa)(1)(B)(i). *See Terry v. Community Bank of N. Va.*, 255 Fed.Supp.2d 811, 817 (W.D.Tenn. 2003). In opposition, plaintiffs contend that the points and fees that were financed were nevertheless payable at or before closing and must be counted to reach the HOEPA threshold. *See Short v. Wells Fargo Bank of Mn.*, 401 Fed.Supp.2d 549, 562-63 (S.D.W.Va. 2005); *see also Hodges v. Swafford*, 863 N.E.2d 881, 889 (Ind.App. 2007).

This Court agrees with plaintiffs' reading of the term "payable." Section 1602(aa)(1)(B) uses the word "payable, not the word "paid." The word "payable" refers to a sum "that is to be paid, due, owing; falling due (at or on a specified date...)." *Oxford English Dictionary Online*. Black's Law Dictionary defines "payable" as follows: "(Of a sum of money or a negotiable instrument) that is to be paid. • An amount may be payable without being due. Debts are commonly payable long before they fall due." *Black's Law Dictionary Online* (8th ed. 2004). As the *Short* court observed, the term "payable" "looks to the fact that the consumer bears the cost of those fees at the time of closing, not whether those fees were financed, paid separately or

---

[3](...continued)

of taxes), unless--

(i) the charge is reasonable;

(ii) the creditor receives no direct or indirect compensation; and

(iii) the charge is paid to a third party unaffiliated with the creditor; and

(D) such other charges as the Board determines to be appropriate.

deducted from the loan proceeds." 401 Fed.Supp.2d at 562. This reading is supported by the Federal Reserve System Board of Governors' commentary on the 2001 amendments to the HOEPA regulations, *see Regulation Z, Supplemetary Information*, 66 FR 65604 *et seq*., 2001 WL 1627493; the applicable commentary consistently treats "points and fees" in section 1602(aa)(1)(B)(i) as including qualifying charges regardless of whether they are paid in cash or financed. For example, the Board notes that, in determining points and fees, "premiums paid at or before closing for credit insurance are included whether they are paid in cash or financed" (emphasis added). *Supplement to Part 226 Official Staff Interpretations, id.* at 65620; *see generally id.* at 65608-65610. Finally, as noted above, TILA is a remedial statute with the stated purpose of assuring a meaningful disclosure of credit terms and avoiding the uninformed use of credit. *See* 15 U.S.C. § 1601(a). Adoption of defendant's proposed interpretation of section 1602(aa)(1)(B)(i) would allow lenders to manipulate the payment of points and fees to avoid triggering HOEPA requirements, thus impeding the accomplishment of Congress' goals.

Accordingly, the Court rejects defendant's contention that as a matter of law points and fees that are financed are not "payable by the consumer at or before closing" and cannot be counted to reach the eight percent threshold in section 1602(aa)(1)(B)(i). Defendant is not entitled to summary judgment on this ground.

**Applicability of HOEPA; calculation of points and fees**

Having determined that the term points and fees "payable by the consumer at or before closing" does not exclude those charges that are financed, the Court turns to consider whether the points and fees in plaintiffs' loan, including the financed charges, reach the eight percent threshold of 15 U.S.C. § 1602(aa)(1)(B)(i). Defendant contends that as a matter of law the $905

fee for title search and title insurance ("title services") cannot be counted in calculating points and fees and that therefore plaintiffs cannot meet the eight percent threshold.

On this issue, both parties rely on the definition of "points and fees" in sections 226.4 and 226.32 of Regulation Z. 12 C.F.R. §§ 226.4, 226.32. Read together, these sections define "points and fees" as including "fees for title examination, abstract of title, [and] title insurance" unless "the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor" (emphasis added). 12 CFR 226.4(c)(7); 226.32(b)(1)(iii). The regulation defines "affiliate" as "any company that controls, is controlled by, or is under common control with another company[.]" 12 C.F.R. § 226.32(b)(1)(iv) (citing 12 U.S.C. § 1841(k)).

Plaintiffs argue that the evidence shows the $905 charge for title services was paid to Integrated Real Estate Solutions ("IRES"), which is undisputedly an affiliate of defendant, and that therefore the sum must be included in calculating points and fees. Plaintiffs argue in the alternative that the record presents a question of fact on the issue.

Defendant admits that IRES is an affiliate of defendant. Defendant argues, however, that the evidence establishes that the $905 charge for title services was paid not to IRES but rather to Integrated Real Estate Processing, LP ("IREP").[4] According to defendant, IREP is not an affiliate of defendant, and therefore the charge cannot be included.

On the question of whether the $905 charge for title services was paid to IRES (defendant's affililate) or IREP, both parties rely in part on documentary evidence. Such evidence is not, however, dispositive. Among the documents relied on by plaintiffs is the HUD-

[4] Integrated Real Estate Processing, Inc. ("IREP Inc.") is the general partner in IREP, LP. Except when there a reason to distinguish the two entities, the Court refers to them collectively as "IREP".

1A Settlement Statement signed on March 27, 2001 by plaintiffs and Veronica Bailey, an account executive with defendant's "umbrella" company, Household International ("HI"), who acted as defendant's settlement agent for the closing on plaintiffs' mortgage. The HUD-1A statement reflects a $905 payment to IRES for title insurance and a $290 appraisal fee to IREP. Plaintiffs also rely on the "Loan Close Document Checklist" which Bailey filled in and signed on the same day. The checklist, under the heading "Approval Documents," includes the following items: "IREP final appraisal," "IRES/IREP final title report," "IREP preliminary appraisal," and "IRES/IREP preliminary title report." And under the heading "Loan Closing Documents" the checklist includes the following: "IRES Title Invoice" and "IREP Appraisal Invoice." Further, the division management instructions maintained by HI in its computer program concerning plaintiffs' mortgage state that in April 2001 (that is, shortly after the March 27, 2001 closing) IRES informed HI and defendant that IRES had recorded the mortgage documents in the County Clerk's office. In contrast, the title report, recording confirmation, and title insurance schedule A, relied on by defendant, all refer solely to IREP.

Nor is the question conclusively resolved by the deposition testimony of Michael E. Forgas, a non-party witness and an officer of IREP. Forgas testified that IREP provided the title services for plaintiffs' mortgage. He based this conclusion on the title report, recording confirmation, and title insurance schedule A, all of which refer solely to IREP. However, upon questioning by plaintiffs' counsel regarding the interrelationships among IREP, IRES, and related entities, Forgas' testimony was less clear. Particularly when considered in conjunction with the "Support Services Agreement" entered into between IRES and IREP LP in 1999, and other documentary evidence, his testimony does not conclusively rule out the possibility that the title

fees were actually paid to IRES or that IREP may properly be viewed as an affiliate of defendant.[5] Accordingly, defendant has not established as a matter of law that plaintiffs' title service fees were not paid to an affiliate of defendant.

Also relevant to the issue is the deposition testimony of defendant's corporate designee, Mary F. Sawyer, who stated that HI was a 50% partner in IRES, a vendor of title services, that IRES performed such services for defendant, and that the only vendors of such services used by defendant in New York were IRES and IREP. Sawyer states that the title search abstract and title insurance policy for plaintiffs were prepared by IREP; that "they made a mistake in entering an S on the HUD [*i.e.*, the HUD-1A Settlement Statement] versus a P on the HUD"; and that she assumes the reason for the error was "because we were in the midst of the changeover and being instructed to do what the invoices say, and just in the habit of doing something, human nature, to enter what it always has been." She also stated that "there was a period of time where we were using both [IRES and IREP]."

On this record, Forgas' and Sawyer's testimony is not conclusive proof that plaintiffs' title services were performed by IREP as opposed to IRES, particularly when the testimony is viewed

---

[5] For example, Forgas testified that since 1996, he had been officer or director of the following entities: NREIS LP; NREIS Holdings LP; National Real Estate Information Services, Inc. (general partner in NREIS LP and NREIS Holdings LP); IRES (a joint venture of NREIS Holdings LP and Household Servicing LP, a wholly-owned subsidiary of HI); and IREP LP and/or IREP Inc. (apparently wholly-owned subsidiaries of an NREIS entity). He stated that from 1999 through 2001, IRES, IREP Inc., IREP LP, and the NREIS entities were all located in the same four-story building; it appears there were no other tenants in the building. On June 16, 1999 Household Servicing LP and NREIS Holdings LP entered into the "Venture Agreement" forming IRES; Forgas signed the agreement on behalf of NREIS Holdings LP in his capacity as Vice President of NREIS, Inc. It appears that IREP LP and IREP Inc. were formed the following day, June 17, 1999 as wholly-owned subsidiaries of one of the NREIS entities. And on June 16, 1999, IRES and IREP LP entered into a "Support Services Agreement"; Forgas signed it on behalf of IREP LP in his capacity as President of its general partner IREP Inc. The Support Services Agreement recognized that IREP had certain expertise and resources, and engaged IREP to perform services on behalf of IRES, including administrative processing of all orders, human resources, all internal functions, and any other function requested by IRES. Indeed, Forgas was not sure whether IRES ever had any employees, and testified that it was possible under the Support Services Agreement that IRES' functions would be performed by IREP employees.

in light of the Loan Close Document Checklist used by Bailey for plaintiffs' mortgage. Moreover, the record does not establish that, as a matter of law, IREP is not affiliated with defendant.

An additional factor contributing to the uncertainty regarding the true nature of the title services charge is the fact that plaintiffs were invoiced for $905 for title services, whereas defendant paid only $763 for such services. Relying on this fact, plaintiffs contend that defendant received direct or indirect compensation in connection with the $905 charge, and that therefore the charge was not a *bona fide* charge. *See* 12 C.F.R. § 264.4(c)(7). On this record, Forgas' testimony that this discrepancy resulted from an error in IREP's invoice, an error which he first discovered in April 2006 while preparing for the deposition in this case, is insufficient to resolve the matter, as is the evidence that IREP paid $142 to defendant after Forgas' deposition.

Defendant is not entitled to summary judgment on the ground that the points and fees do not reach the eight percent threshold. Nor are plaintiffs entitled to summary judgment on this issue.

**Rescission**

Plaintiffs contend that defendant violated TILA by failing to provide plaintiffs with the required three-day notice of their right of rescission. *See* 15 U.S.C. § 1635(a).[6] This and all other TILA disclosure requirements apply to HOEPA transactions. *See* 15 U.S.C. § 1639(a)(1). Where

[6] 15 U.S.C. § 1635(a) provides:

> [T]he obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

the lender fails to give proper notice of the right to rescind, the rescission period is extended for three years after the date of consummation of the transaction. *See* 15 U.S.C. § 1635(f). Thus, plaintiffs contend that their rescission letters, dated March 5 and 11, 2004, were timely.

TILA provides that the borrower's written acknowledgment of receipt of any required disclosures "does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1635(c). To rebut the presumption, the borrower must present evidence to the contrary. *See Williams v. First Gov't Mortg. & Investors Corp.*, 225 F.3d 738, 751 (D.C.Cir. 2000) (stating that presumption of delivery requires borrower to come forward with evidence to meet presumption but does not shift burden of proof to borrower).

Here, plaintiff Winifred Macheda states in her affidavit the following:

> At the closing at our home the agent for Household did not have copies of the forms she handed to us to sign. We signed the forms and she took all of the forms with her when she left.
>
> The only form we had when the agent left our home was the Notice of Right to Cancel form she had passed out to me to sign.... She had handed one Notice of Right to Cancel to my husband and one Notice of Right to Cancel to me. When she gave us the form to sign she instructed me and my husband to sign both the front and back of each form. I refused to sign the back of the form and kept my form. I kept this form because I did not think what she was doing was right. The agent retrieved the form that she had given my husband, which both he and I had signed on the front.
>
> When the agent returned to our home on April 1, 2001 with the check for us to endorse as payment to Robert Riedl [a prior mortgagee whose mortgage was satisfied in the course of this transaction] I signed the back of the Notice of Right to Cancel which the agent had retrieved on March 27, 2001.

The affidavit of plaintiff Richard Macheda is fully consistent with that of his wife. [7]

[7] Richard Macheda's affidavit states:

(continued...)

Plaintiffs' evidence that defendant failed to provide each plaintiff with two copies of the Notice of Right to Cancel is sufficient to raise a question of fact barring summary judgment. *See, e.g., Jobe v. Argent Mortg. Co., LLC*, 2008 WL 450432, *4-5 (M.D.Pa. Feb 15, 2008) (finding plaintiffs' sworn statements that they were not each given two copies of Notice of Right to Cancel sufficient to rebut presumption and defeat summary judgment); *Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50, 64-65 (D.D.C. 2002) (same); *Hanlin v. Ohio Builders & Remodelers, Inc.*, 212 F.Supp.2d 752, 762 (S.D.Ohio 2002) (same).[8] Neither plaintiffs nor defendant are entitled to summary judgment on this issue.

**Remaining issues**

Plaintiffs concede they are not entitled to rescind the portion of the loan that refinanced their previous loan with defendant. *See* 15 U.S.C. § 1635(e). Defendant is entitled to partial summary judgment in its favor establishing that there is no right of rescission as to this portion of

[7](...continued)

At the closing at our home the agent for Household did not have copies of the forms she handed to us to sign. We signed the forms and she took all of the forms with her when she left.

The only form we had when the agent left our home was the Notice of Right to Cancel form she had passed out to my wife to sign. She had handed one Notice of Right to Cancel to me and one Notice of Right to Cancel to my wife. When she gave us the form to sign she instructed me and my wife to sign both the front and back of each form. My wife refused to sign the back of the form and kept the form. The agent retrieved the form that she had given me, which both my wife and I had signed on the front and I had signed on the back.

When the agent returned to our home on April 1, 2001 with the check for us to endorse as payment to Robert Riedl my wife signed the back of the Notice of Right to Cancel which the agent had retrieved on March 27, 2001.

[8] The Court is aware of cases finding a borrower's statement of non-receipt insufficient to rebut the section 1635(c) presumption of delivery. *See, e.g., Oscar v. Bank One, N.A.*, 2006 WL 401853, *3-4 (E.D.Pa. Feb. 17, 2006), *appeal dismissed* 223 Fed.Appx. 164 (3d Cir. 2007) (finding plaintiff's statement of non-receipt insufficient to rebut the presumption; granting summary judgment to lender); *Golden v. Town & Country Credit*, 2004 WL 229078, *2 (D.Minn. Feb. 3, 2004) (same). Particularly in view of the remedial purpose of TILA to give consumers meaningful disclosures and encourage the informed use of credit, *see* 15 U.S.C. § 1601(a), this Court declines to follow such cases. The Court notes also that *Williams v. First Gov't Mortg. & Investors Corp.*, 225 F.3d 738, 751 (D.C.Cir. 2000), relied on by defendant, is inapposite; it does not concern summary judgment but rather district court's post-trial dismissal of plaintiffs' TILA claim based on its evaluation of plaintiff's trial testimony.

the loan. The other issues raised by the parties do not warrant summary judgment.

**CONCLUSION**

It is therefore

ORDERED that defendant's motion (Dkt. No. 45) for summary judgment is granted insofar as it seeks partial summary judgment establishing that plaintiffs are not entitled to rescind the portion of the loan that refinanced plaintiffs' previous loan with defendant, and is otherwise denied; and it is further

ORDERED that plaintiffs' motion (Dkt. No. 48) for partial summary judgment is denied, and it is further

ORDERED that the parties are directed to file a Joint Status Report on or before July 7, 2008, outlining any outstanding issues, and the estimated length of trial, and it is further

ORDERED that a Settlement Conference is set for July 31, 2008 at 10:00 a.m., in Syracuse, New York.

IT IS SO ORDERED

June 26, 2008
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge